Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7013 | **DATE** | 8/7/2002 |
| **CASE TITLE** | Bedenfield vs. P.O. R. Shultz and P.O. J. Geisbush | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, defendants' motion for summary judgment is DENIED [10-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| X | Notified counsel by telephone. | | AUG 08 2002 date docketed | 23 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | klb (lc) courtroom deputy's initials | 02 AUG -7 PM 6:20 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

KENDELL BEDENFIELD, )
)
    Plaintiff, )
) No. 01 C 7013
v. )
) HONORABLE DAVID H. COAR
P.O. R. SHULTZ AND P.O. J. GEISBUSH, )
)
    Defendants. )

DOCKETED

AUG 0 8 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Kendell Bedenfield ("plaintiff" or "Bedenfield") brought a two-count complaint in this Court under 42 U.S.C. § 1983 ("Section 1983") and under the common law of battery for the alleged excessive force used by Chicago Police Officer Shultz ("Shultz") and Chicago Police Officer Geisbush ("Geisbush") (collectively "defendants" or "officers") during an investigatory stop on February 14, 2001. Before this court is the defendants' motion for summary judgment in its favor. The defendants argue (1) that their use of force was reasonable and (2) that they are entitled to qualified immunity for their actions. For the reasons set forth below, defendants' motion for summary judgment is denied.

**1.**    **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine

issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511.

## II. Factual Background

The following facts are taken from the parties Local Rule 56.1 Statement of Uncontested Facts. The defendants essentially stipulated to plaintiff's version of the facts, when the facts

conflicted, for purposes of this summary judgment motion. Kendell Bedenfield is an African American male that was 57 years of age at the time of the incident. Bedenfield is approximately 5'11" tall and weighs 270 pounds. On February 14, 2001, plaintiff was wearing a leather jacket and a leather money belt around his waist. Officer Shultz is approximately 6' tall and weighs about 205-210 pounds. Officer Geisbush is approximately 6' 3" tall and weighs 215 pounds.

On February 14, 2001, Shultz and Geisbush were partners working the midnight shift, in uniform. At approximately 7:30 a.m., they received a call of a hold-up alarm at the currency exchange at 63rd and Western. When they received the call, they were directly in front of the currency exchange. Shultz answered the call and crossed over onto the curb with his front wheels in front of the currency exchange. Plaintiff was exiting the currency exchange when he saw a police car come up on the curb. After the squad call pulled past him, plaintiff walked approximately five feet to his van. Plaintiff's sixteen year old son Dawson was waiting in the van and saw the police pull up on the curb.

The officers observed plaintiff coming out of the building and exited their vehicle. Because there was the possibility of an armed robbery in progress, the officers believed that they might be confronting an armed suspect. Shultz and Geisbush drew their service weapons. Plaintiff heard one of the officers say "Hey you. Come here." Plaintiff's son Dawson heard the officers' voices but didn't hear what they were saying. Plaintiff did not realize that the officer was talking to him. Shultz called out to the plaintiff again at which time plaintiff turned and looked towards the officer, who had his service weapon pointed in plaintiff's direction. Plaintiff stopped walking and told the officer, "you come to me." Plaintiff stated in his deposition that he told the officer to come to him because he was afraid and did not want to walk toward the officer

and be perceived as aggressive. Shultz grabbed plaintiff's arm and shoved him against his van without speaking to him. Plaintiff put his hands on the van and Shultz conducted a pat-down search for weapons.

After the pat down of the outside of plaintiff's clothes, Shultz believed plaintiff was unarmed. Geisbush then went into the currency exchange to check on the alarm. Geisbush returned and told Shultz that the alarm was false and there had been no armed robbery. Shultz then stated "I'm going to write him up" and told the plaintiff to get in the back of the squad car. Shultz purportedly wanted to fill out a contact card to explain why they stopped Bedenfield and what actions were taken. Shultz and Geisbush sat in the front seat of the car and plaintiff sat in the back seat. The squad car doors were unlocked. One of the officers explained to plaintiff that they had stopped him because they were responding to a hold up alarm at the currency exchange. The officers showed plaintiff the computer screen with the call on it. Plaintiff gave the officers his name and produced identification. Shultz asked plaintiff if he had any weapons and plaintiff laughed. Shultz asked plaintiff a second time if he had any weapons, and plaintiff laughed and said, "You searched me. You should know if I had a weapon."

The officers then exited the car and instructed the plaintiff to get out of the vehicle. Plaintiff got out of the car on his own and "assumed the position" over the car. Shultz told plaintiff he was going to search him. Shultz attempted to put his hand in the outside left pocket of plaintiff's leather jacket at which point plaintiff pulled his hands off the car and put one hand down to the side and reached the other hand across and put it over Shultz's hand. Plaintiff told the officer that he was violating his rights and not to go in his pockets. Plaintiff was quoting Terry v. Ohio as he took his hands off of the car. One of the officers then called plaintiff a

"smart fucker.". Shultz was holding plaintiff's left arm and Geisbush grabbed his right arm, and although they tried, they could not get plaintiff's arms behind his back. Both arms were taken behind plaintiff's back and at that point plaintiff was called a "smart nigger." Plaintiff protested while the officers attempted to handcuff him. Shultz called for back up. The officers pushed plaintiff's arms up so that his fists were going up near his shoulder blades. Plaintiff was bent over the trunk at that point, because one of the officers had put the force of his body against plaintiff. To plaintiff, it felt as if one of the officers had "pounced" on his back. The officer next hit plaintiff with his forearm in the back of his neck. The officer was then pressing his thumb behind plaintiff's ear and plaintiff believed the officer was trying to find a pressure point. Plaintiffs arms then came down and the officers put the handcuffs on one of his wrists. Plaintiff, hurt by the officers' attempt to handcuff him, told the officers they needed to go back to the academy for training.

Plaintiff's son Dawson witnessed his father being pushed down on the hood and approached the officers from behind while they were still trying to handcuff plaintiff, and the officers ordered him to get back in the car and not to walk toward the officers. The second handcuff was then placed on plaintiff's other wrist. Plaintiff stood straight up when both handcuffs were on, and heard the officers call for back up. Other units had begun to respond to Shultz's call for assistance, so once plaintiff was handcuffed Shultz gave a "slow down" call to the responding units. Other squad cars arrived on the scene, and plaintiff was placed in another car and driven to the station by other officers.

Plaintiff was placed in a room at the station and Shultz and Geisbush came into the room, and then went and got a watch commander. The officers wrote up the report in the room, and

asked plaintiff to empty his pockets. After plaintiff emptied his pockets and counted his money, he told the officers that he was in pain, and one of them left the room. Plaintiff was taken to lock up, and made a phone call to OPS. After plaintiff called OPS, he was fingerprinted and photographed and after about twenty minutes was taken to the hospital. Plaintiff was seen by a doctor at the hospital, but did not tell the doctor what had happened to him, because the doctor did not ask. Plaintiff was with the doctor for approximately fifteen minutes, and the doctor told him he had a sprained neck, prescribed him Tylenol, and told him to see his regular physician. Plaintiff and his wife drove home from the hospital. After arriving home, plaintiff told his family about the incident.

On February 16, 2001, two days after the incident, Bedenfield went to the West Side VA Hospital, where he was diagnosed as having a strained neck. On May 17, 2001, plaintiff saw Dr. Karim Tourk, who examined Bedenfield and told him he needed an MRI. On June 13, 2001, the MRI of plaintiff's neck was taken and plaintiff was diagnosed as having suffered herniations of his cervical disks at C3-4 and C4-5 and a central spinal cord injury or a stretched spinal cord. On June 22, 2001, Bedenfield was informed that he needed to go immediately to VA Hospital, that he had a cervical myelopathy and needed surgery. On July 5, 2001, Bedenfield underwent surgery that involved a bone graft and the attachment of a metal plate to his cervical spine and required him to spend about a week in the hospital recovering. Two joints in plaintiff's neck are fused and immobile. He has, and will have no range of motion at those joints. Bedenfield's mobility has significantly diminished since the injury and he now uses a cane for the first time.

## III. Discussion

Plaintiff alleges that Shultz and Geisbush used excessive force in violation of his Fourth Amendment rights. He further alleges that the officers' actions constitute a state law claim for battery. Defendants argue that summary judgment is appropriate in their favor because they did not use excessive force in effecting the arrest. Defendants also maintain that they are entitled to qualified immunity. Finally, defendants argue that the Illinois Tort Immunity Act bars the state law claim against the officers. Each of these arguments will be addressed in turn.

The first question this Court must answer, however, is whether the second search and subsequent arrest of the plaintiff was legal. In Terry v. Ohio, the Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. Terry, 392 U.S. at 27. Further, "the scope of the Terry search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (quotations omitted).

In Royer, the Supreme Court explained that during a Terry investigatory stop, the person approached by the police does not have to answer any questions. 460 U.S. 491, 497-98, 103

S.Ct. 1319, 75 L.Ed.2d 229 (1983) (citations omitted). In fact, the person would be within his rights to simply decline to listen and go on his way. Id. at 498. Finally, the Court explained that an individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." Id.

Initially when the officers approached Bedenfield they were in a heightened state of alertness because they were responding to a hold up alarm and knew they could encounter an armed suspect. Consistent with Terry, the officers, with their guns drawn, conducted an investigatory stop, patted Bedenfield down, and did not discover any weapons. This was clearly a valid stop under Terry. The officers had reasonable suspicion because they received the hold up alarm call and then saw Bedenfield exiting the currency exchange. After the officers had satisfied themselves that they were not in any danger, one of the officers went into the currency exchange and found out that it was a false alarm. At this point, any further suspicion ceased to be reasonable. Bedenfield was then told to get in the squad car. Bedenfield was not handcuffed and the squad car door was unlocked. The officers did not tell Bedenfield that he was free to leave. Bedenfield then provided the officers with identification and contact information. When the officers asked Bedenfield if he had any weapons he laughed and told them they should know because they patted him down. The officers then told him to get out of the car and a second search was performed.

The second search is the problem in this case. At the point when the second search occurred, the officers did not have a "reasonable suspicion" that criminal activity was afoot. There was no probable cause (or even reasonable suspicion) that a crime had been committed. The policemen had already conducted a protective pat down search of Bedenfield when they

thought he was an armed robber. It is simply not reasonable to conclude that the initial pat down, taken at a time when the officers believed that Bedenfield might be an armed robber, would be less thorough than one undertaken after concluded that no robbery had occurred. Bedenfield's laughing respone to the inquiry as to possession of weapons was ill considered, and perhaps irreverent and disrespectful, but it hardly amounted to probable cause. Probable cause was the appropriate standard because, according to Bedenfieldk, this was no pat down, the officer attempted to place his hand in Bedenfield's pocket. Once the officers knew that it was a false alarm, the "reasonable suspicion" that the officers had when they initially detained Bedenfield had dissipated. See Garcia v. City of Chicago, Illinois, 24 F.3d 966, 975 (7th Cir. 1994) (if the evidence that forms probable cause for a warrantless arrest dissipates ... continued dentention is unconstitutional); see also United States v. Jones, 99 CR 387, 1999 U.S. Dist. LEXIS 18245, at *35 (N.D. Ill. Nov. 16, 1999) (applying the concept of dissipation to a Terry stop). The officers had no reason for continued suspicion of Bedenfield. Thus, the second search was certainly not "tied to or justified by" the circumstances which led the officers to initially stop Bedenfield. See Royer, 460 U.S. at 499.

Bedenfield had absolutely no obligation to answer the officers' questions. See Royer, 460 U.S. at 498. Nonetheless, Bedenfield cooperated and provided identification and contact information once in the squad car. Bedenfield's answer to the officers' question about weapons certainly did not supply the "reasonable suspicion" necessary to justify a second search. A smart remark has not been found to justify continued detention and a second intrusive search. See e.g., United States v. Johnson, 910 F.2d 1406, 1509-10 (7th Cir. 1990) (reasonable suspicion continued when suspect answered question with nervousness or trembling); United States v. Lawal, 1994

WL 194050, #4 (N.D. Ill. 1994) (reasonable suspicion continued where suspect was shaking and sweating profusely); Sibron v. New York, 392 U.S. 40, 66-67, 88 S.Ct. 1889, 1904-05 (1968) (reasonable suspicion continued where suspect engaged in deliberately furtive actions); Tom v. Voida, 963 F.2d 952, 960 (7th Cir. 1992) (reasonable suspicion continued where suspect made uncomfortable glances at the officers). Most recently, the Seventh Circuit has explained that any behavior, such as nervousness or refusal to make eye contact, will not, standing on its own, justify a Terry stop and pat-down. Rather, such behavior must be considered as a factor in the " totality of the circumstances." United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999). Here, the totality of the circumstances would not lead a reasonable officer to suspect Bedenfield of wrongdoing. The officers knew it was a false alarm and had already preformed a protective pat down. The officers do not allege that Bedenfield engaged in any suspicious behavior. To the contrary, the evidence is that Bedenfield was cooperative. Police officers may not place their hands on citizens "in search of anything" without "constitutionally adequate, reasonable grounds for doing so." Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). An officer may not conduct a protective search for purposes of safety until he has a reasonable suspicion that supports the investigatory stop. See United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000), citing, Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In this case, the officers' reasonable suspicion had dissipated long before the second pat down took place. The officers do not even allege that they reasonably suspected Bedenfield of committing a crime at the time they committed the second search - a necessary prerequisite.

Even if the officers had reasonable suspicion, however, their search exceeded the bounds of Terry. Terry allows a protective pat down search on the outside of an individual's clothing.

The officers reached into Bedenfield's pockets.[1] At some point, the Terry stop turned into an arrest. The officers handcuffed Bedenfield. The use of handcuffs alone, however, does not elevate a Terry stop to an arrest. United States v. Glenna, 878 F.2d 967 (7th Cir. 1989) (collecting cases). It is not clear to this Court whether the officers handcuffed Bedenfield to gain control of him, whether they intended to arrest Bedenfield from the moment he was taken out of the car, or whether Bedenfield was under arrest after he put his hand on the officer's hand to prevent him from reaching in his pocket. The officers stated in their deposition that they planned on charging Bedenfield with assault. Bedenfield, however, was never informed of the charge against him, despite numerous requests. Bedenfield was taken to the station and was photographed and fingerprinted. The parties have not furnished any records to this Court regarding the alleged assault charge or the eventual disposition of that charge. Any arrest of Bedenfield and any search following the initial pat down were unconstitutional.[2]

---

[1] The officers claim that the reason they reached into plaintiff's pocket is because they felt a metal object. In fact, it was later discovered that plaintiff had keys in his pocket. It is evident to this court that a reasonable officer would know the difference between keys and a potential weapon. Further, the officers had previously patted down the plaintiff when they suspected he was an armed robber and did not feel compelled to reach into his pocket to investigate the alleged metal object. It is incredulous for the officers to assert that they performed a better search of the plaintiff after he made a smart remark than they did when they suspected him of being an armed robber.

[2] If Bedenfield was arrested, the time of the arrest is crucial because in Illinois an individual does not have the right to use force to resist an arrest, even if the arrest is unlawful. 720 ILCS 5/7-7. There is a limited exception, however, when the officer(s) use excessive force to effectuate that arrest. The use of such force by the police officer(s) invokes the right of self-defense. See People v. Williams, 267 Ill.App.3d 82 (Ill. App. Ct.1994). The officers do not, however, expressly claim that Bedenfield was resisting arrest.

**A.   Excessive Force**

For purposes of ruling on defendants' motion for summary judgment, the court will assess the officer's use of force assuming that they had some right to detain Bedenfield. Whether an officer used excessive force during an arrest is determined under the "objective reasonableness" standard. The officers' actions are assessed "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used is reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The Supreme Court has instructed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the fourth amendment." Id. [3]

From the point that the officers found out that the call was a false alarm there was no probable cause or reasonable suspicion. It is clear that the officers did not consider themselves to be in danger at that point because they ordered Bedenfield into the police car without handcuffing him and they did not lock the doors. The officers also claim that Bedenfield was free to go at any

---

[3] The Supreme recognized in Graham v. Connor that "our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." 490 U.S. at 396. A reasonable officer in defendants' position could have believed that a slight shove was necessary to get the plaintiff against the van and prevent harm to himself under the circumstances the officers were presented with.

point, although they did not inform Bedenfield of that fact. Once in the police car, Bedenfield cooperated with the officers by supplying his name and providing identification.

The officers then asked Bedenfield if he had any weapons. Bedenfield responded with laughter and stated that they should know because they had just searched him. The officers then decided to perform a second pat down of Bedenfield and ordered him out of the vehicle. Again, at this point, Bedenfield was not suspected of any wrongdoing and was only in custody to fill out a contact card. It was in the course of this pat down and handcuffing that Bedenfield alleges the officers used excessive force. Bedenfield was hit or struck by the officer's forearm on the back of the neck and his head was slammed down on the trunk. The officer's thumb was behind Bedenfield's ear trying to find a pressure point to inflict pain. The officers were pulling Bedenfield in different directions. The officers directed racial slurs at Bedenfield when he told them they were violating his rights, mentioned Terry v. Ohio, and told the officer not to go in his pocket. As a result of the incident on February 14, 2001, Bedenfield has had to undergo surgery that involved a bone graft and the attachment of a metal plate to his cervical spine. Two joints in Bedenfield's neck are permanently fused and he has, and will have no range of motion in these joints. Bedenfield's mobility has significantly diminished since the injury and he now uses a cane.

Under the criteria in Graham, the use of force by Shultz and Geisbush was objectively unreasonable. The first factor is the severity of the crime at issue - Bedenfield was NOT suspected of committing any crime. The second factor is whether the suspect poses an immediate threat to the safety of the officers or others - Bedenfield never threatened the officers or committed any acts of aggression toward the officers and the officers had already patted him

down and determined he was unarmed. Further, Bedenfield cooperated with the officers' effort to fill out the contact card. The third factor is whether he was actively resisting arrest or attempting to evade arrest by flight. Bedenfield was not under arrest. He was sitting in the back seat of an unlocked police car without handcuffs. If he wanted to flee, he certainly could have done so. Further, the officers claim that Bedenfield could have left at any time and did not have to cooperate with their questioning, yet it was allegedly the answer to one of those questions that led to the second search and alleged excessive force. Bedenfield did attempt to stop the officers from reaching into his pocket during the second search because he believed the officers were violating his rights under Terry v. Ohio.[4] That alone, however, is not sufficient to justify the level of force and the resulting permanent injury to the plaintiff. The plaintiff's terrible injuries are objective evidence of the excessive force used by defendants. See e.g., Saucier v. Katz, 533 U.S. 194, 209 (2001) (finding of no excessive force is confirmed by the fact that the respondent did not suffer hurt or injury); Meyer v. Robinson, 992 F.2d 734, 739 (7th Cir. 1993) (discussing the presence and extent of injuries as relevant to the excessive force inquiry). A reasonable jury could determine, under the totality of the circumstances, that the force used against Bedenfield in conducting the second pat down search was excessive. Accordingly, summary judgment on that ground is improper.

### B. Qualified Immunity

---

[4] A legitimate Terry stop depends upon an officer's ability to produce articulable facts giving rise to a reasonable suspicion that a defendant "has been, is, or is about to be engaged in criminal activity. See U.S. v. Smith, 3 F.3d 1088, 1095 (7th Cir. 1993). While defendants had a reasonable suspicion of criminal activity to justify detaining Bedenfield when they first happened upon the scene, it is clear that reasonable suspicion dissipated when they found out the robbery was a false alarm. Thus, Bedenfield's questioning the propriety of the officer's conduct in performing the second search was not unwarranted.

The defendants argue that even if this Court finds that the force used was excessive, they are shielded by qualified immunity. Police officers, as public officials, are entitled to qualified immunity for their official actions if "a reasonable officer could have believed [the action taken was] lawful, in light of clearly established law and the information the officers possessed." Anderson v. Creighton, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); Estate of Starks v. Enyart, 5 F.3d 230, 233 (7th Cir. 1993). The plaintiff has the burden of showing that defendants' alleged wrongful conduct violated a clearly-established constitutional right. Erwin v. Daley, 92 F.3d 521, 525 (7th Cir. 1996). The qualified immunity defense "erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." Kernats v. O'Sullivan, 35 F.3d 1171, 1177 (7th Cir. 1994) (citations omitted).

In Saucier v. Katz, the Supreme Court clarified the qualified immunity inquiry in excessive force cases. 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court held that "qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest." The Court explained that the initial inquiry is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. This Court has already answered that question in the affirmative. The search was not justified by reasonable suspicion and a reasonable jury could find that the force used was unreasonable. "[T]he next, sequential step is to ask whether the right was clearly established." Id. at 201. Graham v. Connor, supra, clearly establishes that the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. However, the Supreme Court has

explained that is not enough. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, the dispositive inquiry is " whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (citations omitted).

The question in this case is whether it was clearly established, on February 14, 2001, that pushing an *innocent* citizen across the trunk of the car and pressing down on his back and neck in an effort to search and put handcuffs on him is constitutionally impermissible behavior under the Fourth Amendment. Plaintiff may meet his burden of establishing the existence of a clearly established right by (1) pointing to a closely analogous case that established a right to be free from the kind of force used on him, or (2) showing that the force was so plainly excessive that, as an objective manner, the officer would have been on notice that he was violating the Fourth Amendment. See Erwin v. Daley, 92 F.3d 521, 525 (7th Cir. 1996); Johnson IV v. City of Milwaukee, 41 F.Supp.2d 917, 929 (E.D. Wis. 1999). This case falls under the second category. The officers did not have reasonable suspicion that Bedenfield was engaged in criminal activity. They knew that the hold up at the currency exchange, their original reason for detaining plaintiff, was a false alarm. They had absolutely no justification for detaining Bedenfield and thus any force that was used in an effort to continue to detain him was objectively unreasonable. "[P]olice officers do not have the right to push, shove, or otherwise assault innocent citizens without any provocation whatsoever." Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996). If the officers are arguing that they were provoked, then that is a matter for the jury to determine.

It is disturbing to this court that two officers who have inflicted life long injuries on a fifty-seven year old man, who was not accused of any wrongdoing, would attempt to excuse their conduct by claiming that it was not clearly established that what they were doing constituted excessive force. Using force of any kind on a citizen the officer knows to be innocent is unreasonable. Officials can still be on notice that their conduct violates established law even in novel factual circumstances. See, e.g., Hope v. Pelzer, 122 S.Ct. 2508 (2002); McDonald v. Haskins, 966 F.2d 292 (7th Cir. 1992) ("It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books."). Under the circumstances presented in this case, a reasonable officer would have known that banging an innocent citizen against the hood of a car, when reasonable suspicion is lacking, is impermissible conduct. Accordingly, a jury could find that a reasonable officer would know that such conduct was unlawful. Thus, the officers are not entitled to qualified immunity for their actions.

C.  Battery

Defendants argue that summary judgment should be granted in their favor on Count II because plaintiff cannot maintain a cause of action for battery. A person commits a battery if he intentionally or knowingly "without legal justification" causes bodily harm to an individual ... or makes physical contact of an insulting or provoking nature. Cross v. City of Chicago, 1992 WL 245586, *8 (N.D. Ill. 1992), citing, People v. Villareal, 114 Ill.App.3d 389, 449 N.E.2d 198, 203 (Ill. App. Ct. 1983). Police officers are legally entitled to use force which they reasonably believe to be necessary to effect an arrest and any force he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. 720 ILCS 5/7-5. As

discussed above, in section III.A., a reasonable jury could find that the amount of force used by the police officers was excessive. Defendants argue that they are entitled to immunity from plaintiffs' tort claims pursuant to the Illinois Local Government and Local Governmental Employee's Tort Immunity Act ("Illinois Tort Immunity Act"). The Illinois Tort Immunity Act "entitles local government employees to immunity from tort liability in the 'execution or enforcement of any law' unless their conduct is 'willful and wanton.'" Carter v. Chicago Police Officers, 165 F.3d 1071, 1080 (7th Cir.1998) (quoting 745 ILCS 10/2-202). Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm, or if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. A reasonable jury could find, in accordance with the facts giving rise to the excessive force claim, that the officers acts were wilful and wanton.

Finally, defendants argue that all claims for punitive damages must be dismissed in accord with 745 ILCS 10/2-102 of the Illinois Tort Immunity Act. That provision states, in relevant part, "no public official is liable to pay punitive or exemplary damages in any action arising out of an act or omission made by the public official while serving in an official, executive, legislative, quasi-legislative or quasi-judicial capacity." 745 ILCS 10/2-102. Defendants were serving in their official capacity at the time of the incident but are being sued in their individual capacity because of their alleged use of excessive force. Courts in this district have disagreed as to whether the Tort Immunity Act shields police officers sued in their individual capacities from liability for punitive damages. See McCray v. Herman, No. 99 C 1495, 2000 U.S. Dist. LEXIS 7296, 2000 WL 684197 (N.D. Ill. May 23, 2000) (allowing recovery of punitive damages in suit against officer in individual capacity); McNamara v. Foley,

No. 97 C 4944, 1998 U.S. Dist. LEXIS 11093, 1998 WL 409418 (N.D. Ill. July 15, 1998) (same) (collecting cases). This Court, like the most recent courts to address the issue, finds that the Illinois Tort Immunity Act does not shield police officers from punitive damages when they are sued in their individual capacity. Thus, summary judgment is denied on Count II of the complaint.

Conclusion

For the foregoing reasons, defendants' motion for summary judgment is DENIED.

Enter:

_David H. Coar_
David H. Coar
United States District Judge

Dated: August 7, 2002